# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE DIVISION

| | | |
|---|---|---|
| **HEIDI FOREMAN** | * | **CIVIL ACTION NO. 12-2833** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993.  Heidi Foreman, born February 27, 1973, filed applications for a period of disability and disability insurance benefits on August 24, 2009,[1] and supplemental security income on August 26, 2009, alleging disability as of June 16, 2008, due to neck pain and mental disorders.[2]

---

[1]Claimant has acquired sufficient quarters of coverage to remain insured through December 31, 2011.  (Tr. 12).  Thus, she must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

[2]Claimant states that although she alleged an onset date of June 16, 2008, the evidence of record "more strongly supports an onset date of August 1, 2009." [rec. doc. 10, p. 1 n. 1; Tr. 180-82].  Thus, the undersigned will use August 1, 2009, as the alleged onset date.

<u>FINDINGS AND CONCLUSIONS</u>

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's decision of non-disability.

In fulfillment of Fed. R. Civ. P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is not supported by substantial evidence, based on the following:[3]

**(1) Records from Dr. Joseph Henry Tyler Mental Health Center dated May 5, 2008 to December 25, 2008**.  On July 29, 2008, claimant was admitted for major depression disorder, polysubstance abuse, and borderline personality disorder.  (Tr. 280).  She had previously been admitted on November 2, 2002, for depression and borderline personality disorder.  (Tr. 292-302; 424; 533-34).  She was smoking a pack of cigarettes and drinking a pint of hard liquor daily, and had also used cocaine and marijuana.  (Tr. 268, 276).  Her Global Assessment of Functioning ("GAF") score was 30.[4]  (Tr. 280).

---

[3]Although all of the medical records were reviewed by the undersigned, only those relating to the arguments raised in the parties' briefs are summarized herein.

[4]The GAF is a subjective determination based on a scale of 100 to 1 of "the clinician's judgment of the individual's overall level of functioning."  *Dunn-Johnson v. Commissioner of Social Sec. Admin.*, 2012 WL 987534, *2 (N.D. Tex. March 22, 2012) (*quoting* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) at 32).

At discharge on August 5, 2008, claimant had improved.  (Tr. 267).  Her medications included Neurontin, Topamax, Strattera, Robaxin, Ultram, and Tranxene.  (Tr. 266).  Her GAF score was 50.  (Tr. 260, 265).

On September 30, 2008, claimant's diagnoses were major depressive disorder, ADHD, and polysubstance abuse.  (Tr. 285).  Her GAF score was 60.

On December 17, 2008, claimant reported that her medications were okay. (Tr. 384).  She claimed that she had backed off on her use of illegal substances tremendously.  She appeared to be stable with average mood.

### (2) Consultative Examination by Dr. Eric Cerwonka dated May 2, 2009.

Claimant complained of a herniated disc in her neck, and major depression for most of her life.  (Tr. 312).  She reported that she had been arrested for aggravated battery in June, 2006, and had not worked since.  (Tr. 313).  She stated that she was receiving monthly treatment at Tyler Mental Health Center.

The record indicted prior diagnoses of MDD, borderline personality disorder, and a history of cutting.  Claimant's medications included Atomoxetine, Venlafaxine, Phenobarbital, and Gabapentin.

On examination, claimant's mood was mildly depressed, and her affect was restricted.  She denied both alcohol and drug abuse.  She was alert and oriented to person, place, time, and situation.

3

Comprehension and fund of general knowledge seemed good.  Claimant's remote memory was intact and demonstrated recent memory was fair.  Attention and concentration skills were fair.  Pace and persistence were fair.

Estimated intellectual functioning was in the average range.  (Tr. 314). Claimant's ability to understand the objective reality of a situation, assess a situation correctly, and act appropriately seemed mildly impaired.  Insight appeared to be fair, and judgment fair to poor.

Dr. Cerwonka's impression was major depressive disorder, recurrent, moderate, borderline personality disorder, and seizure disorder.  Claimant's GAF score was 65.  He noted that although she exhibited some breakthrough symptoms of depression, she seemed to have experienced a fair effect from her medication regimen.  He opined that her disorders would not be expected to prevent her from working.

Additionally, Dr. Cerwonka noted that claimant had experienced some abatement of many of the behaviors from her personality problems, including cutting.  He opined that she had no intellectual limitations or cognitive deficits which would be expected to prevent her from working.  He stated that during the examination, she was able to understand, retain, and follow instructions, and sustain enough concentration and attention to perform simple and more complex

tasks.  He also observed that, based on her interview behavior, claimant seemed able to relate well to others on a one-to-one basis when motivated.  He concluded that there did not seem to be any psychiatric, cognitive, or behavioral problems which would prevent her from regular, full-time work.

**(3) Consultative Examination by Dr. Scott C. Chapman  dated May 6, 2009**.  Claimant complained of cervical spine pain, seizure disorder, and mental illness.  (Tr. 317).  She stated that she was involved in a violent altercation in May, 2008, which resulted in neck pain.  She reported left hand tingling in the first three digits, and pain and tightness in the trapezius muscles.

Additionally, claimant reported that she began having seizures in 2000, but had not had a seizure for approximately one year.  She also stated that she was receiving mental health treatment every two to four weeks for personality disorder, depression, and bipolar disorder.  Her biggest symptom was ongoing depression.  Her medications included Gabapentin, Benzothoxzine, Phenobarbital, and Strattera.  (Tr. 318).

On examination, claimant had tenderness to palpation in the neck over the C5 through C7 levels, lower lumbar spine, and right SI joint.  (Tr. 318-19).  Straight leg raising was negative.  (Tr. 319).  She had moderate spasm to the trapezius muscles.

5

Claimant had minimal ankle jerk reflexes.  She had decreased light touch to the C6 and C7 dermatomes on the left.  Motor strength was 5/5.  Grip strength, manual dexterity, and movement and gait were normal.

On mental status examination, claimant appeared depressed.  Her thought process and content were intact.  Mood was appropriate, and affect was congruent.  Memory, concentration, and comprehension were intact.  Insight and judgment were good.

X-rays revealed severe spondylosis at the C5 through C7 levels.  (Tr. 320).

Dr. Chapman's impressions were cervical spine trauma resulting in significant neck pain with significant osteodegenerative changes and a bulging disc at C6-C7 on MRI, seizure disorder controlled with medications for approximately one year, and a long history of depression, personality disorder, and bipolar disorder.  At that point, her medications had not significantly impacted her depression.  He recommended continued follow up for her mental health, neck, and seizure disorders.

**(4) Records from Medical Center of LA New Orleans dated July 6, 2009 to September 21, 2009**.  On July 6, 2009, claimant reported being assaulted in May, 2008, resulting in an exacerbation of preexisting neck pain.  (Tr. 323).  She

6

also stated that she had been dropping things and had hand numbness.  An MRI dated June, 2008, showed a C6-C7 herniated nucleus pulposus.  (Tr. 324).

On August 3, 2009, claimant complained of worsening neck pain from her neck down into her left arm and first three fingers.  (Tr. 327).  An MRI showed a C6-C7 disk herniation on the left side with foraminal narrowing.  Dr. Everett G. Robert recommended a C6-C7 anterior cervical diskectomy and fusion, which was performed on August 25, 2009.  (Tr. 329).

On September 21, 2009, claimant reported resolution of her left upper extremity radiculopathy, but complained of neck pain which worsened with movement, occasional extension into her shoulders, and some numbness in her left fingers.  (Tr. 331).  On examination, she had 5/5 strength in the upper extremities. Her scripts for Lortab and Valium were refilled, and she was given a C-collar per her request.

**(5) Records from Dr. Joseph Henry Tyler Mental Health Center dated January 21, 2009 to August 21, 2009**.  On January 21, 2009, claimant reported no problems or complaints, but said that she wanted to see a doctor about adjusting her medications.  (Tr. 383).  She appeared to be stable with average mood.  On March 23, 2009, she appeared to be stable with moderately depressed mood.  (Tr. 382).

On April 23, 2009, claimant reported recent stomach distress and intermittent anxiety/panic attacks.  (Tr. 424).  Her diagnoses were major depressive disorder, recurrent, unspecified, attention-deficit/hyperactivity disorder, not otherwise specified, anxiety disorder, not otherwise specified, and polysubstance dependence.  Her medications included Neurontin, Strattera, Rozerem, and Effexor.  Her GAF score was 60.

On June 1, 2009, claimant reported feeling depressed and suffering with chronic pain.  (Tr. 379).  She stated that she had been attacked at a Circle K one night, and a man hit her head and grabbed her arms.  She claimed that her prescribed medications did not help, and she resorted to using marijuana or alcohol at times to help with her mood.

Claimant had a cut on her left forearm and wrist.  She appeared to be depressed and disappointed in herself for cutting.  Her diagnoses were major depressive disorder and polysubstance dependence.  (Tr. 346).  Her GAF score was 60.

On June 3, 2009, claimant complained of depression, irritability, racing thoughts, chronic pain, poor memory, slurred speech, and poor sleep.  (Tr. 378). She was taking Effexor and stopped it due to nightmares.  She had been very emotional in recent days with crying spells.

On August 21, 2009, claimant had stopped taking Elavil because she had developed a rash.  (Tr. 373).  She had also stopped Rozerem, but was taking Neurontin and Strattera as prescribed.  She reported significant anxiety when off of antidepressants.  She denied feeling depressed, but described some emotional numbing on exam.

**(6) Records from University Medical Center ("UMC") dated May 29, 2009 to September 17, 2009**.  On May 29, 2009, claimant complained of pain in her neck, wrists, and elbows after being shoved to the ground.  (Tr. 470).  An MRI showed a stable-appearing left-sided disk herniation at C6-7.  (Tr. 462).

**(7) Records from Dr. Joseph Henry Tyler Mental Health Center dated October 7, 2009 to December 28, 2009**.  On October 22, 2009, claimant complained of worsening depression over the past four to six weeks.  (Tr. 483).  On examination, her mood was depressed, and her affect was sad.  She was prescribed Zoloft.

On December 28, 2009, claimant was doing fairly well.  (Tr. 481).  She stated that she was doing better since starting Zoloft, but complained of some breakthrough anxiety and sleep problems.  Her depression seemed to have improved, and she appeared stable.  She said that she been stayed drug-free for at least two years.

Claimant's diagnoses were major depression, ADHD, and polysubstance dependence.  (Tr. 476).  Her GAF score was 60.

**(8) Consultative Examination by Dr. Scott Chapman dated December 16, 2009**.  Claimant complained of back pain, neck pain, and depression.  (Tr. 487).  She reported that her fusion had helped with the pain radiating into the left arm, but she still had numbness and tingling into both arms.  Additionally, she stated that while Zoloft had provided a significant improvement in her depressive symptoms, her depression continued to be aggravated by chronic pain.  Her medications included Atomoxetine, Sertraline, and Gabapentin.  (Tr. 488).

On musculoskeletal examination, claimant had moderate tenderness to palpation of the left sacroiliac joint, biceps tendon, and right anterior shoulder. (Tr. 489).  Psychologically, she had no homicidal or suicidal ideations.  Her cranial nerves were intact.

Claimant had decreased light touch in a right C6 and C7 dermatomal distribution.  Cerebellar function was intact.  She had 5/5 strength throughout. Grip strength/manual dexterity and movement/gait were normal.

On mental status examination, claimant's thought process  and content were intact.  Her mood was appropriate, and affect was congruent.  Memory, concentration, and comprehension were intact.  Insight and judgment were good.

10

Dr. Chapman's impressions were sensory neuropathy to the right upper extremity and some tenderness to the sacroiliac joint with no significant neurological findings into the lower extremities, and a long history of depression with good response on antidepressants.  (Tr. 490).  He stated that "[i]t is too early to tell what patient's long term outcome will be as she just had her surgery several months ago," and that "[i]t could take as long as a year to a year and a half to know what her permanent status will be."  He opined that claimant would more than likely require life-long mental health treatment, particularly considering her underlying chronic pain syndrome.

**(9) Physical Residual Functional Capacity ("RFC") Assessment by Dr. Charles Lee dated January 12, 2010**.  Dr. Lee determined that claimant could lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk and sit about six hours in an eight-hour workday, and had unlimited push/pull ability.  (Tr. 495).  She could occasionally climb ramps/stairs, kneel, crouch, and crawl, frequently balance and stoop, and never climb ladders/ropes/scaffolds.  (Tr. 496).  She was limited as to reaching all directions, including overhead, but unlimited as to handling, fingering, and feeling.  (Tr. 497).  She had no environmental limitations, except that she had to avoid all exposure to hazards such as machinery and heights because of seizure precautions.  (Tr. 498).  Dr. Lee concluded that

11

claimant should be able to perform all routine self care, chores, cook, shop, and do house work.  (Tr. 499).

**(10) Psychiatric Review Technique ("PRT") and Mental RFC Assessment by Kelly Ray, Ph.D. dated February 8, 2010**.  In the PRT, Dr. Ray assessed claimant for ADHD, NOS, MDD, borderline personality disorder by history, and a history of drug use.  (Tr. 503-11).  She found that claimant had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and concentration, persistence, or pace, and one or two episodes of decompensation, each of extended duration.  (Tr. 513).

In the Mental RFC Assessment, Dr. Ray determined that claimant was moderately limited as to her ability to maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers, and respond appropriately to changes in the work setting.  (Tr. 517-18).

She found that claimant had the intellectual ability to learn and remember detailed instructions, but that her depression would limit her ability to function at

12

the level of responsibility often associated with detailed work.  (Tr. 519).  She

concluded that claimant would reasonably be expected to have the ability to

perform simple to moderately detailed routine work at a low level of responsibility

that did not require consistently high levels of attention and concentration or

extensive cooperation with others.

**(11) Records from Dr. Joseph Henry Tyler, Jr. Mental Health Center**

**dated February 19, 2010**.  On February 19, 2010, claimant complained that she

continued to suffer from chronic pain.  (Tr. 526).  She had charges for assault and

other similar charges against her arising from an automobile accident in May,

2009.  She indicated that she had a history of substance abuse, but drugs were no

longer part of her life.  She also stated that she was epileptic and had stopped

taking Phenobarbital because she did not like the way it made her feel.

Additionally, she indicated that she was not responding well to Zoloft.

During the session, claimant cried periodically throughout.  She described a

life-long difficulty with depression.  She denied suicidal and homicidal ideations.

**(12) Records from UMC dated January 15, 2010 to August 24, 2010**.

An MRI of the lumbar spine dated March 19, 2010, was negative.  (Tr. 547).

On March 25, 2010, claimant complained of burning, tingling, numbness

and pain in her hands.  (Tr. 543).  The assessment was hand radiculopathy.

In the Medical Source Statement of Ability to do Work-Related Activities dated April 15, 2010, Dr. Radha Vanukuri determined that claimant could never lift/carry up to 10 pounds.  (Tr. 551).  She found that claimant could sit and stand/walk 10 to 20 minutes without interruption, and one hour over an eight-hour period.  She checked that claimant needed to elevate her legs intermittently to relieve pain, swelling or other symptoms.

Further, Dr. Vanukuri found that claimant needed to take unscheduled breaks every 30 minutes and rest 20 minutes before returning to work because of pain and fatigue.  (Tr. 552).  Additionally, Dr. Vanukuri checked that claimant would need to miss work or leave early at least once a week.  She also noted that claimant's Phenobarbital would cause drowsiness/sedation.  She checked that claimant would be limited to reaching, handling, feeling, and fingering bilaterally.

**(13) Records from Tyler Mental Health Center dated February 20, 2010 to November 5, 2010**.  On March 24, 2010, claimant continued to have severe depression symptoms of anhedonia, fatigue, poor focus/concentration, low appetite, hopelessness, helplessness, excessive guilt, and passive thoughts of death.  (Tr. 567).  Chronic pain and loss of hand strength added to her depression.  Her Zoloft was increased.

14

On May 3, 2010, claimant had remained drug-free for over a year. (Tr. 566). Her depression remained despite the increase in her Zoloft dose, and claimant indicated worsening emotional blunting with increased medication. Concentration, energy level, and sleep were poor. She was easily overwhelmed, often irritable with others, and had a difficult time in general dealing with people.

On mental status examination, claimant's speech was slow and soft, mood depressed, and affect blunted. Dr. Lindsey Legnon decreased her Zoloft and added Cytomel. Her diagnosis was changed to "in remission" for polysubstance dependence.

On July 28, 2010, claimant reported continual difficulty concentrating, constant racing thoughts, sleep disturbance, improved depression, social anxiety, and multiple physical problems. (Tr. 563). She stated that she was easily distracted, and daydreamed continually at times. Debra J. Milson, LCSW, opined that claimant presented above average, but had multiple physical problems with ongoing depression that would "definitely" interfere with her ability to maintain employment.

On August 23, 2010, claimant was crying and reported one cutting episode. (Tr. 562). She admitted transient thoughts of suicide. She reported intense dreams

15

to the point where she was not rested.  She also complained of trouble

concentrating and focusing.

On September 10, 2010, claimant admitted to suicidal thoughts without

plan.  (Tr. 561).  She thought her muscle relaxers for her neck injury were not

helping.  She appeared to be preoccupied.

On November 5, 2010, claimant reported that the addition of Cytomel was

helpful for mood and energy, but then it seemed to drop off.  (Tr. 559).  She ran

out of Cytomel due to lack of funds.  She remained depressed with low energy,

low motivation, hopelessness, and occasionally passive suicidal ideations.  On

examination, she was tearful with depressed mood and dysphoric affect, and lost

her train of thought at times.  Her Cytomel was increased.

### (14) Records from UMC dated April 8, 2010 to August 25, 2010.

On May 11, 2010, claimant complained of hand swelling and neck,

shoulder, and hip pain.  (Tr. 580).  Cervical spine x-rays showed status-post

anterior spinal fusion at C6-C7, bursal of the normal lordosis, and limited range of

motion in flexion.  (Tr. 578).

On August 11, 2010, claimant complained of severe pain to the neck and

shoulders.  (Tr. 575).  Her pain was 10/10.

(**15) Consultative Examination by Alfred E. Buxton, Ph.D., dated**

**March 29, 2011**.  Claimant reported that her mental health was "a roller coaster."

(Tr. 599).  She stated that she had been attending the local mental health center off

and on since age 12, and was currently going once a month.  She had one

psychiatric inpatient stay in 2008 secondary to suicidal ideation.  She noted a

history of cutting with the last reported incident in July, 2010.  She was taking

Zoloft 50 mg. daily.

Claimant's sleep was restless even with medication.  Appetite was fair, and

energy was poor.  Socially, she was usually to herself, which was a chronic

pattern.  She occasionally painted and did some food preparation.  Cleaning and

shopping were reduced due to pain.  She was able to manage money,

communicate, manage time independently, and engage in independent local travel.

On examination, claimant's verbal receptive and expressive language skills,

dress and groom, social skill, and ability to attend and concentrate were good.

Recent and remote memories were intact.  Pace was even with a regular rate of

performance and a normative response latency.

Intellect appeared to be within normal limits.  Judgment, reasoning, and

reflective cognition were good.  Insight was fair.  Cognitions were clear and

cogent.

17

Mood was of a mild to moderate dysphoria.  Affect was mood congruent.

Claimant noted episodic passive suicidal ideation.  Self-image was a bit poor.

Administration of the Wechsler Adult Intelligence Scale – IV yielded a full-

scale composite score of 80.  Intellect was dull normal/low average.  (Tr. 600,

601).  Results of the Minnesota Multiphasic Personality Inventory – II revealed

Schizoaffective Disorder.  (Tr. 600).

Dr. Buxton's impression was Schizoaffective Disorder, with a fair response

to psychoactive medication; complaints of chronic pain, and a Personality

Disorder, Not Otherwise Specified with borderline features.  (Tr. 601).  He

recommended continued outpatient mental health intervention to deal with the

Schizoaffective Disorder, pain complaints, and characterological defects, in

addition to the use of psychoactive medication and counseling.  He noted that

long-term intervention was likely to be required.

Claimant's GAF score was 55 over the previous 12 months.  Dr. Buxton

found that she was bright enough to understand simple as well as complex

instruction and command, though secondary to the negative impact of her

Schizoaffective Disorder and pain complaints she might have an above-average

level of errors of omission and commission in her attempts to discharge her duties.

He further determined that other than for relatively brief intervals of time, she

18

might well not perform in a reliable and dependable fashion as an employee secondary to the negative impact from her Schizoaffective Disorder and pain complaints on her functional capabilities as well as the possibility of any breakthrough seizures.

Dr. Buxton further found that with the accumulation of frustration and stress claimant would encounter in the job setting, she might well have exacerbation in the epileptiform seizures.  Additionally, he determined that with the accumulation of frustration and stress, one might also see some exacerbation in her Schizoaffective Disorder, an increase in her pain complaints, and a tendency to act or behave in a fashion that might work to her own demise.  (Tr. 602).

He also noted that she might be able to establish, but might well have difficulty maintaining, mutually rewarding relationships with co-workers and supervisors alike secondary to the negative impact of the Schizoaffective Disorder, pain complaints, and characterological defects on those relationships.

In conclusion, Dr. Buxton stated that, "should she demonstrate significant abatement in her chronic pain and maintenance of current emotional stability with no reactivation in terms of any active seizure episodes, as revealed through feedback from treating professionals and interventionists, then at that point in time an attempt to re-enter the labor market would be appropriate."

In the Medical Source Statement of Ability to do Work-Related Activities (Mental), Dr. Buxton found that claimant was moderately impaired as to her ability to understand, remember, and carry out simple instructions; make judgments on simple work-related decisions; interact appropriately with the public, supervisors, and co-workers, and respond appropriately to usual work situations and to changes in a routine work setting.  (Tr. 591-92).  He determined that she was markedly limited as to her ability to understand, remember, and carry out complex instructions, and make judgments on complex work-related decisions. (Tr. 591).

**(16) Claimant's Administrative Hearing Testimony**.  At the hearing on January 4, 2011, claimant was 37 years old.  (Tr. 38).  She stated that she was 5 feet 4 inches tall, and weighed about 170 pounds.  She had a driver's license, but was unable to drive.

Claimant had an Associate's Degree in graphic communication.  She had last worked in July, 2008, designing a ladies' magazine.  She had also been a decorative painter.  (Tr. 41).  She reported that she still tried to paint and work on things at home, but had trouble holding her paint brushes because of numbness and burning in her hands.  (Tr. 42).

As to impairments, claimant testified that she was receiving mental health treatment at Henry Tyler Mental Health from Dr. Legnon once or twice a month. (Tr. 40).  She reported that she had memory problems.  Additionally, she complained of right-sided pain from her head down to her hip.  (Tr. 44).

Claimant reported that she had not had a grand mal seizure since 2007.  (Tr. 31).  She stated that she was no longer on Phenobarbital.  She testified that she was taking Zoloft, Cytomel, Strattera and Neurontin, which caused confusion, forgetfulness, and slurred speech.  (Tr. 32, 39).  She said that she had not consumed alcohol for almost two years.  (Tr. 32).

Regarding limitations, claimant testified that she could walk about 15 minutes, stand about 10 minutes, and sit for about 10 to 20 minutes.  (Tr. 39).  She stated that she could lift about a pound or two.  (Tr. 40).

As to activities, claimant testified that she watched a little bit of television, but had trouble following the storyline.  She also said that she had trouble with crowds and was uncomfortable around strangers.  She reported that she washed dishes when she could.  (Tr. 43).

**(17) Administrative Hearing Testimony of Dr. Jimmie D. Cole, Medical Expert ("ME")**.  Dr. Cole testified that claimant did not meet or equal a listing for a mental impairment.  (Tr. 34).  However, he found that she did have an

21

impairment which would limit her ability to work.  He opined that she would not do well in high-stress activities where she would have to meet quotas or would have great contact with the general public, but could do repetitive, simple, and involved tasks.   He stated that she did not seem to have any cognitive dysfunction, but more depression and problems with stress.  (Tr. 35).

When claimant's attorney asked whether she would be restricted in her ability to function reliably eight hours a day, five days a week, if she had episodes every month or two of being unable to concentrate, Dr. Cole testified that she would if it occurred on a very consistent basis.  (Tr. 35).  Claimant's attorney then asked whether claimant's difficulties with chronic pain could affect her ability to maintain concentration and pace for eight hours a day, five days a week, to which Dr. Cole agreed that it would.  (Tr. 37).

**(18) Administrative Hearing Testimony of William M. Stampley, Jr., Vocational Expert ("VE")**.  Mr. Stampley classified claimant's past work as a creative director as sedentary and skilled, and a painter as light and skilled.  (Tr. 46).  The ALJ posed a hypothetical in which he asked the VE to assume a claimant aged 37 with 14 years of education, who had the ability to perform sedentary work which was low stress, and required simple, routine, repetitive tasks, and minimum contact with the general public.  In response, Mr. Stampley testified that she could

22

not do her past work, but could work as a final assembler, of which there were 621

positions statewide and 62,025 nationally, and addresser, of which there were 351

positions statewide and 25,954 nationally.  (Tr. 47).

When claimant's representative asked whether those jobs would be

eliminated if claimant was unable to use her hands for repetitive motion, the VE

responded that it would totally eliminate the final assembler position.

At the conclusion of the hearing, the ALJ ordered a post-hearing

consultative psychological examination.  (Tr. 48).

**(19) The ALJ's Findings**.  Claimant argues that the ALJ failed to properly

evaluate the medical opinion evidence in accordance with 20 C.F.R.

§§ 404.1527(c), 414.927(c), and SSR 96-6p.  Because I find that the records show

that claimant was unable to sustain work activity due to her mental condition, I

recommend that this matter be **REVERSED**, and that claimant be awarded

benefits.

First, claimant argues that the ALJ erred in giving weight to Dr. Cerwonka's

out-of-date opinions rather than Dr. Buxton's.  [rec. doc. 10, p. 8].  The ALJ

discounted Dr. Buxton's opinion that, other than for relatively brief intervals of

time, claimant might not perform in a reliable and dependable fashion as an

employee secondary to the negative impact of the Schizoaffective disorder and the

23

pain complaints, as well as the possibility of breakthrough seizures, on the grounds that his opinions "appeared to be based on the claimant's mental condition as well as her physical conditions," which was "beyond his area of expertise."  (Tr. 19, 601).  Additionally, the ALJ gave no weight to Dr. Buxton's findings that claimant had marked limitations regarding complex instructions and moderate limitations as to the remaining mental activities, because they were "inconsistent" with the other opinions in the record and the medical evidence.  (Tr. 591-92).  Further, he rejected claimant's argument that Dr. Buxton's report should be given controlling weight on the grounds that Dr. Buxton was not a treating physician.

In addition to the findings stated above, Dr. Buxton found that with the accumulation of frustration and stress claimant would encounter in the job setting, she might well have exacerbation in the epileptiform seizures.  (Tr. 601).  Further, he determined that with the accumulation of frustration and stress, one might also see some exacerbation in her Schizoaffective Disorder, an increase in her pain complaints, and a tendency to act or behave in a fashion that might work to her own demise.  (Tr. 602).  He also noted that she might be able to establish, but might well have difficulty maintaining, mutually rewarding relationships with co-workers and supervisors secondary to the negative impact of the

Schizoaffective Disorder, pain complaints, and characterological defects on those relationships.

In conclusion, Dr. Buxton stated that, "should she demonstrate significant abatement in her chronic pain and maintenance of current emotional stability with no reactivation in terms of any active seizure episodes, as revealed through feedback from treating professionals and interventionists, then at that point in time an attempt to re-enter the labor market would be appropriate."

Dr. Buxton's opinion indicates that claimant would be unable to work until she demonstrated "significant improvement" in her overall functional status.  At this point, the medical records demonstrate that she has not.

Social Security Ruling 96-6p provides, pertinent part, as follows:

1. Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review.

2. Administrative law judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions.

The Social Security Regulations state that ALJs cannot ignore the opinions of state agency medical and psychological.  SSR 96-6p.  In fact, this regulation

further provides that "[a]lthough the administrative law judge and the Appeals Council are responsible for assessing an individual's RFC at their respective levels of administrative review, the administrative law judge or Appeals Council *must consider and evaluate* any assessment of the individual's RFC by a State agency medical or psychological consultant and by other program physicians or psychologists." (emphasis added).  This requirement is mandatory.  The ALJ did not do so with regard to Dr. Buxton's opinion.

Here, the ALJ gave greater weight to the opinions of Dr. Cerwonka, who examined claimant on May 2, 2009, which was over two years prior to Dr. Buxton's evaluation and the ALJ's decision.  Additionally, he gave weight to the opinion of Dr. Ray, who was a nonexamining source.  (Tr. 19, 503-19). It is well established that an examining sources' opinion is generally entitled to more weight than the opinion of a nonexamining source.  20 C.F.R. § 404.1527(c).

Additionally, the ALJ failed to mention claimant's more current records from her treating physicians at Tyler Mental Health Center and referred only to reports from August 2008 and June 2009.  (Tr. 15, 20).  It is clear that the ALJ must consider all the record evidence and cannot "pick and choose" only the evidence that supports his position.  *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

In *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001), the Court held that an ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization. *Id*. at 621 (*citing Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000)).  Here, the ALJ referred to only selected records from claimant's long-time treating sources at Tyler Mental Health Center and did not consider the more recent records indicating that she continued to have severe symptoms of depression despite medication compliance.

On March 24, 2010, claimant continued to have severe depression symptoms of anhedonia, fatigue, poor focus/concentration, low appetite, hopelessness, helplessness, excessive guilt, and passive thoughts of death.  (Tr. 567).  On May 3, 2010, her depression remained despite an increase in her Zoloft dose.  (Tr. 566).  On July 28, 2010, she reported continual difficulty concentrating, constant racing thoughts, sleep disturbance, improved depression, social anxiety, and multiple physical problems.  (Tr. 563).  Her treating social worker opined that claimant's multiple physical problems with ongoing depression would "definitely" interfere with her ability to maintain employment.

27

The finding that claimant would be unable to maintain employment is further supported by Dr. Buxton, who was retained by the Social Security Administration.  In Dr. Buxton's report, which is the most recent in the record, he opined "should she demonstrate significant abatement in her chronic pain and maintenance of current emotional stability with no reactivation in terms of any active seizure episodes, as revealed through feedback from treating professionals and interventionists, then at that point in time an attempt to re-enter the labor market would be appropriate."  (Tr. 602).  According to Dr. Buxton's opinion, claimant would not be able to re-enter the job market at this point.

A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that she can physically perform certain jobs; it also requires a determination that the claimant can hold whatever job she finds for a significant period of time." *Watson v. Barnhart*, 288 F.3d 212, 217 (5th Cir. 2002) (*citing Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986)).  Further, the ability to work only a few hours a day or to work only on an unpredictable or intermittent basis does not constitute the ability to engage in "substantial gainful activity." *Tucker v.*

*Schweiker*, 650 F.2d 62, 64 (5th Cir. 1982); *Cornett v. Califano*, 590 F.2d 91, 94 (4th Cir. 1978); *Prestigiacomo v. Celebrezze*, 234 F.Supp. 999 (E.D. La. 1964).

Here, the ALJ failed to determine whether claimant was capable not only of obtaining employment, but also maintaining it. *Watson*, 288 F.3d at 218. Accordingly, the undersigned finds that ALJ erred.[5]

Based on the foregoing, it is my recommendation that the Commissioner's decision be **REVERSED**, and that claimant be awarded benefits as of August 1, 2009.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the

---

[5]Claimant also argues that the ALJ erred in rejecting the postural, environmental, and manipulative limitations posited by Dr. Lee, which violated controlling law.  [rec. doc. 10, p. 10].  Additionally, she argues that the ALJ's RFC assessment was defective as it did not incorporate all of her functional limitations.  In the most recent consultative examination by Dr. Chapman, he noted that "[i]t could take as long as a year to a year and a half to know what her permanent [post-cervical fusion] status will be." [Tr. 490].  Because the undersigned is recommending that claimant be awarded benefits based on her mental condition, it is not necessary to address her physical complaints at this time.

time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR. *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed January 28, 2014, at Lafayette, Louisiana.

_C. Michael Hill_
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

Copy sent:  RFD
On:  1/30/2014
By:  MBD